**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KEZIAH RIDGEWAY,**<br>                    **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **THE SCHOOL DISTRICT OF<br>PHILADELPHIA,** *et al*<br>                    **Defendants.** | **NO.  25CV2440** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff, Keziah Ridgeway ("Ridgeway"), has brought suit against the Philadelphia

School District ("the District") and nine individually named Defendants: Tony Watlington, Lynn

Rauch, Richard Gordon, Jeremy Skinner, Subriya Jubilee, Michelle Chapman, Nadia McCrimon,

Oz Hill, and Omar Crowder.  She alleges that the District and the individually named Defendants

each: (1) retaliated against her because of her First Amendment activity; (2) violated her Due

Process rights during an employment disciplinary proceeding; (3) violated her Equal Protection

rights by treating her differently from a similarly situated individual; (4) intentionally inflicted

emotional distress; and, (5) violated the Pennsylvania Whistleblower Law, 43 Pa. C.S.A.

§§1421-28.  Defendants have filed, pursuant to Federal Rule of Civil Procedure 12(b)(6), a

Motion to Dismiss all counts in the Amended Complaint.  For the reasons that follow, the Motion

will be granted in part and denied in part.

I.      **FACTS**[1]

Ridgeway is a teacher with the District.  She is a Muslim woman of African American

descent and a vocal pro-Palestine advocate.  Between August 2016, and September 2024, she

---

[1] The following facts are drawn from Ridgeway's Amended Complaint and are accepted as true for the purpose of the Motion to Dismiss.  *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997).

taught at Northeast High School ("Northeast High").  For her first eight years with the District, Ridgeway received numerous outstanding performance awards and distinguished teaching honors.

Despite her exemplary performance as an educator, Ridgeway complains that some of her colleagues did not treat her with respect, and some of them subjected her to racial and religious harassment.  Specifically, within a month of starting at Northeast High, she was confronted by a white male teacher who interrogated her about her religious affiliation and called her a terrorist. When she reported the incident to the District, Ridgeway was told "just ignore [him] . . . that's just how he is."  Ridgeway observed similar incidents directed against her students:

- some teachers at Northeast High complained about Muslim students organizing an Islamic Awareness week in advance of Ramadan;
- some teachers complained and accused Muslim students of antisemitism because the students spoke Arabic at an assembly; and,
- the same teacher who confronted Ridgeway about her religion later called Black students "stupid" and—in relation to the 2020 election—told them that "you people will never get anywhere."

Ridgeway connects her racial and religious identity with her political support for Palestine, and over the years she noticed that speech in support of Palestine was stymied by the District in a way that other speech was not: students were not allowed to wear keffiyehs[2] or attire with the Palestinian flag; the student newspaper censored an article on Palestine while allowing an article on Israel; and the school cancelled a student-hosted "Ask a Palestinian" Zoom event after receiving complaints from Jewish teachers and alumni.  The District did not, however, suppress all pro-Palestine speech.  It approved a student club at Northeast High to offer peer

---

[2] A keffiyeh is a red-and-white or black-and-white square cotton scarf traditionally worn in parts of the middle east. The black-and-white keffiyeh is associated with Palestinian culture and, in the U.S., is frequently worn as a symbol of support for the Palestinian cause.

support and bring attention to Palestinians in Gaza and allowed students and faculty, including Ridgeway, to wear and sell "Free Palestine" buttons.

Ridgeway says she herself also faced censorship and harassment because of her pro-Palestine speech, which intensified in late 2023 and throughout 2024. In late 2023, the District cancelled a professional development course that Ridgeway was intending to present entitled "How to teach the Genocide in Palestine in the Classroom." A retired Northeast High teacher called Ridgeway a "terrorist" at a public alumni event and said that Ridgeway was "teaching terrorism." And, around April 2024, a fellow teacher assaulted Ridgeway in the hallway of Northeast High because of her pro-Palestine stance; Ridgeway reported this assault to the District but was met with inaction and indifference.

Around the same time, pro-Israel and Jewish community members, including some Northeast High faculty and staff formed the School District of Philadelphia Jewish Families Alliance ("Jewish Families Alliance"). Ridgeway alleges that over the following months, the organization and its members targeted and harassed her as follows:

- they complained to the District, as well as state and local officials, about a Racial Justice Organizing professional development course she was planning to present on how to teach the conflict in Gaza in the classroom, even though she was participating in this organization on her own time and not in her capacity as a District employee;

- they monitored her private social media accounts where she made political posts, including "Free Palestine" and "Israel is an Apartheid State;"

- they engaged in a letter writing campaign, sending over 1,500 emails to state and local officials accusing her of antisemitism and demanding that she be fired;

- they posted about her in their social media group, a closed page which only members could access; and,

- in the summer of 2024, they placed her on Canary Mission—a website that publicly labels people as antisemitic and posts their private information online—after which Ridgeway received death threats and constant harassment.

Throughout the spring of 2024, Ridgeway and her students faced increasing scrutiny from the District, fueled by these complaints from the Jewish Families Alliance. When

3

Ridgeway was invited by a colleague to present on African Diaspora International Solidarity as part of the Africana Studies Lecture Series hosted by the Social Studies Department, the Jewish Families Alliance once again complained to the District.  In response, Jeremy Skinner, ("Skinner"), the District's Deputy of Talent, Strategy, and Culture, along with Subriya Jubilee ("Jubilee"), the District's Chief Equity Officer, and Lynn Rauch ("Rauch"), the District's General Counsel, required Ridgeway to submit her presentation slides for their inspection.  Rauch and Jubilee edited the slides to remove anything that could lead to a discussion of Palestine, and Rauch assigned someone to watch Ridgeway's presentation to ensure compliance.  Jubilee then posted an update in the Jewish Families Alliance social media group, informing them that their complaints about Ridgeway were being investigated.

In a related incident that same spring, Ridgeway assigned her students a project for Black History Month, the best of which would be broadcast District-wide.  The winning project, which featured a comparison between Palestinian and African American art as forms of resistance, was approved by Northeast High Principal Omar Crowder ("Crowder").  But, after it was presented at one school assembly, white and Jewish staff members expressed discomfort with the topic upon which the District censored the project, deciding not to show it District-wide.  Following this incident, Ridgeway was told by a white teacher that she needed to "focus on MLK and Harriet Tubman" and that "Palestine has nothing to do with Black history."

Later that spring, at a public meeting Ridgeway confronted the District about its decision to censor the student project and restrict pro-Palestine political speech.  Richard Gordon ("Gordon"), an Assistant Superintendent of the District, admitted that the District had made a mistake in censoring the project.  Separately, Ridgeway also reported that a fellow teacher, Lisa Appel ("Appel"), recorded the student presentation, posted the recording in the Jewish Families

Alliance social media group, and identified the student online, all in contravention of District policy.

The District, which had not investigated Ridgeway's earlier report of the hallway assault, also did not immediately open an investigation into Appel's violation of student privacy. Instead, in April 2024, shortly after Ridgeway made these reports and confronted the District at the public meeting, Skinner directed that an investigation be opened into Ridgeway for alleged antisemitism; an outside law firm was retained to conduct this investigation.

It was not until June 2024, after several months of external pressure, that the District finally opened an investigation into Appel. Appel requested a sabbatical while the investigation was being conducted. Although her request came after a District deadline and Crowder initially denied it, Skinner intervened, overruling Crowder and granting Appel's sabbatical. Appel was represented by a private attorney throughout her disciplinary investigation.

By late summer 2024, Ridgeway says she had faced months of harassment and accusations of antisemitism at the hands of the Jewish Families Alliance and others. In early August, she reported to the District that, following the Black History Month incident, the environment at Northeast High had become hostile toward Muslims. Then, in late August, after gaining access to the Jewish Families Alliance social media page, she posted on her own account "aint no fun when the rabbit got the gun . . . part two is about to drop" ("August Post"). The Jewish Families Alliance reported this post to the District as a threat of gun violence. Six days later, in early September 2024, Gordon and Crowder removed Ridgeway from the classroom, placing her on remote work or paid administrative leave pending the results of an investigation into this post.

During the fall of 2024, the District held at least two hearings and one appeal related to

Ridgeway's August Post.  She was provided with a union representative, but dismissed the representative, unhappy that this person had also supported Appel in her request for a sabbatical. Unlike Appel, Ridgeway was not allowed private representation; Michelle Chapman ("Chapman"), the Chief Deputy of Employee Labor Relations, refused her request to be represented by her own lawyer.

That November, the District opened yet another investigation, this time into whether Ridgeway improperly shared a social media post.  This investigation lasted through at least March of the following year.

By early 2025, the investigation into the August Post was complete, although the November 2024 investigation and the District's investigation into Appel were still ongoing. Even though the District had concluded the investigation into whether Ridgeway threatened gun violence with her August Post, they did not immediately release to her the results: Superintendent Tony Watlington ("Watlington"), directed that the results be withheld until the Appel investigation was also complete.

Finally, on April 11, 2025, the District issued to Ridgeway a five-day unpaid suspension, a permanent reassignment away from Northeast High, and a written warning that future violations of the school's social media policy would result in discipline upon which she filed this lawsuit.

## II.    LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* "Threadbare" recitations of the elements of a claim supported only by "conclusory

statements" will not suffice. *Id.* at 683. Rather, a plaintiff must allege some facts to raise the

allegation above the level of mere speculation. *Great W. Mining & Min. Co. v. Fox Rothschild,*

*LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555). Furthermore, a court

may grant a motion to dismiss under Rule 12(b)(6) if there is a dispositive issue of law. *Neitzke*

*v. Williams*, 490 U.S. 319, 326-27 (1989). When analyzing a motion to dismiss, a complaint

must be construed "in the light most favorable to the plaintiff," with the question being "whether,

under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are

disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those

facts state a "plausible claim for relief." *Id.* at 210-11.

## III.    DISCUSSION

Ridgeway's Amended Complaint presents three theories of liability under 42 U.S.C. §

1983, which she asserts against all Defendants. They are labeled "First and Fourteenth

Amendment retaliation;"[3] "Violation of Fifth and Fourteenth Amendment Due Process;"[4] and,

"Violation of Fourteenth Amendment Equal Protection." Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
> any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

---

[3] The Third Circuit has not recognized a cause of action for retaliation under the Fourteenth Amendment. *Thomas v. Indep. Twp.*, 463 F.3d. 285, 298 n.6 (3d Cir. 2006) (abrogated on other grounds) ("a pure or generic retaliation claim simply does not implicate the Equal Protection Clause") (cleaned up); *see also Jefferies v. City of Phila.*, 2023 WL 4764674, at *3, n.6 (E.D. Pa. July 26, 2023) (Pratter, J.) (collecting cases). Thus, Ridgeway's claims will be considered only within the framework for First Amendment retaliation.

[4] The Fifth Amendment due process protection "only applies to actions taken by the federal government, not state or local governments." *Duffy v. Cnty. of Bucks*, 7 F. Supp.2d 569, 576 (E.D. Pa. 1998); *cf. B&G Const. Co. v. Dir. Off. of Workers' Comp. Programs*, 662 F.3d 233, 246 n.14 (3d Cir. 2011) ("the Fourteenth Amendment applies only to acts under color of state law whereas the Fifth Amendment applies to actions of the federal government."). Because Ridgeway does not allege federal government involvement, the allegation will be analyzed only under a Fourteenth Amendment framework.

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Ridgeway also brings claims under Pennsylvania common law for intentional

infliction of emotional distress, and claims for the violation of the Pennsylvania Whistleblower

Law.  43 Pa. C.S.A. §§1421-28.

### A. *Monell* liability

The District argues, as a preliminary matter, that any claims against it that are brought

under Section 1983 under a *Monell* liability theory [5] must be dismissed because Ridgeway has

not identified an unconstitutional municipal policy or custom that harmed her.  *See Monell v.*

*Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

When a suit is brought against a municipality for a violation of an individual's

constitutional rights, "[l]ocal governments, such as school districts, cannot be held liable under

1983 for the acts of their employees. . . .  [L]ocal governments [however] may be found liable for

their own illegal acts."  *Mann v. Palmerton Area Sch. Dist*. 872 F.3d 165, 174-75 (3d Cir. 2017)

(quoting *Connick v. Thompson*, 563 U.S. 51,60 (2011)).  *Monell* pathways to municipal liability

require a plaintiff to demonstrate an official "policy" or an unofficial "custom" that resulted in a

violation of their rights.  *Monell,* 436 U.S. at 690.  A policy exists "when a 'decisionmaker

possess[ing] final authority to establish municipal policy with respect to the action' issues an

official proclamation, policy, or edict.'"  *Andrews v. City of Phila*., 895 F.2d 1469, 1480 (3d Cir.

---

[5] Ridgeway brings her claims against the named individuals in their personal and official capacities.  However, a claim against someone in their official capacity is tantamount to bringing a claim against the municipality by which they are employed. *Kentucky v. Graham*, 473 U.S. 159, 165 ("Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.").  In that Ridgeway's *Monell* liability claims against the District will be dismissed, as set forth below, so too must the claims asserted against the individually named Defendants in their official capacities.

1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  A custom is established "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Watson v. Abington Twp.,* 478 F.3d 144, 155-56 (3d Cir. 2007) (cleaned up).

"To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).  Regardless of whether the plaintiff is proceeding under a policy or a custom theory, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews,* 895 F.2d at 1480; *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) ("Custom . . . may also be established by evidence of knowledge and acquiescence.").

In addition to setting out a specific policy or custom in their complaint, a plaintiff must also allege that the policy or custom is the "proximate cause" of her injuries.  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  "[Sh]e may do so by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation [s]he alleges." *Id.* (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).  Municipal liability attaches "only when execution of a government's policy or custom . . . inflicts the injury." *Andrews,* 895 F.2d at 1480.

Although there are two headings in Ridgeway's Amended Complaint, which allude to a "policy" of "Religious, Racial, and Ethnic Discrimination" or that Ridgeway made reports of a "custom" of "Religious Discrimination and Racism," those are the only mentions of either a policy or a custom throughout the pleading.  It provides no clarity on what, exactly, the policy or custom was.  *See McTernan*, 564 F.3d at 658 (complaint alleging a general "policy of ignoring

First Amendment right[s]" along with allegations that plaintiff was threatened with arrest and forced to leave Planned Parenthood protest site insufficient to plead a municipal policy). Nowhere in the Amended Complaint is it alleged that there is "an official proclamation, policy, or edict" establishing any such policy, *see Andrews*, 895 F.2d at 1480, and Ridgeway does not indicate with any specificity what the custom was which, under *McTernan*, 564 F.3d at 658, is insufficiently plead.

Nor does Ridgeway plead the necessary causation, or "affirmative link" between any policy or custom and the alleged constitutional harms—the First Amendment retaliation, the Due Process violation, and the Equal Protection violation—that she alleges. *See Est. of Roman*, 914 F.3d at 798. These deficiencies alone require that Ridgeway's *Monell* claims against the District be dismissed.

### i.    *First Amendment Retaliation and Suppression of Pro-Palestine Speech*

In support of the custom or policy of suppression of pro-Palestine speech, Ridgeway's briefing points to a number of instances where the District or the individually named Defendants restricted expression: not permitting students to wear Palestinian flags or keffiyehs; censoring a student newspaper article and the District-wide airing of a student presentation on Palestine; canceling the "Ask a Palestinian" Zoom event; cancelling or censoring professional development trainings on Gaza and Palestine; and, opening an investigation into Ridgeway and disciplining her, allegedly because of her pro-Palestine social media posts. Yet, there are other instances where the District permitted pro-Palestine speech: Northeast High approved a club to bring attention to the situation of Palestinians in Gaza; students and teachers were allowed to wear and sell "Free Palestine" buttons; Northeast High showed a student project on Palestine at an assembly; and, finally, at a public District meeting, after being confronted by Ridgeway, Assistant Superintendent Gordon admitted that the District should not have censored the student

project.  These are not the actions of a municipality that has an official policy of preventing pro-Palestine speech.  Nor is this alleged censorship so pervasive to form a practice that "virtually constitute[s] law."  If either policy or custom existed, it would be expected that such speech would be suppressed generally by the District, rather than the inconsistent practice seen in the Amended Complaint.

Further, although Ridgeway alleges several actions by fellow employees or the Jewish Families Alliance, which she maintains are further evidence of an unconstitutional custom or policy,  she fails to establish that they are attributable to the District, either because she does not show knowledge—and thus a custom established through "the knowledge and acquiescence"— of the policymakers,[6] *see Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996), or because she does not show that they were committed by District actors, *see Mann,* 872 F.3d at 175.  In the case of the hallway assault by a fellow teacher allegedly motivated by Ridgeway's political beliefs, Ridgeway does not plead that District decision- or policymakers had knowledge of the event.  In other cases, such as the comments of a former teacher or the engagement of the Jewish Families Alliance, Ridgeway fails to plead that the alleged actions—posting her information on Canary Mission, sending death threats, or engaging in letter writing campaigns to try to get her fired—were committed by District employees.  It does not follow that some District employees' membership in a broader community organization necessarily allows the attribution of the entirety of that organization's actions to the District.  *See Mann*, 872 F.3d at 174-75 (school districts can be held liable under Section 1983 only for their own illegal acts); *cf. Benn v.*

---

[6] In a footnote in her response brief, Ridgeway asserts that there is a "reasonable inference" that a report to "the District" imputes the knowledge to all the individually named Defendants.  But "[a]n argument made only in a footnote is not worthy of credence (other than to be rejected by footnote)."  *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 457 n.14 (E.D. Pa. 2012)

*Universal Health System, Inc.*, 371 F.3d 165, 169-70 (3d Cir. 2004) (Section 1983 claim requires state action).  These failures are fatal to her *Monell* claims.  Ridgeway cannot support a custom based on knowledge and acquiescence, premised on incidents the policymakers were not aware of, *see Beck*, 89 F.3d at 971-73, nor actions committed by people who are not under the policymakers' authority and supervision, *see id.*; *Benn*, 371 F.3d at 169-70.

### ii.    *Due Process*

Turning to Ridgeway's Due Process claim: it is predicated on the deprivation of her "fundamental right to earn a living as she was an employee of the District" through the denial of "fair and impartial representation at hearings and arbitrarily and unreasonably delaying her investigation," but neither her Amended Complaint nor her briefing link or connect those actions to any unconstitutional policy or custom.  Accordingly, she has insufficiently plead that the alleged violation of her Due Process rights was due to the actions of the municipality, and this claim against the District must be dismissed.

### iii.    *Equal Protection Violation and Religious and Racial Discrimination*

Ridgeway argues that the differential treatment she received during the course of her disciplinary investigations allegedly because of her status as a Muslim and African American, are evidence that her Equal Protection claim is grounded in a District "custom, policy, or practice" of religious and racial discrimination.

But the facts she points to in support—the 2016 confrontation by a teacher about her religious beliefs, the same teacher calling black students "stupid" and telling them "you people will never get anywhere," the white and Jewish teachers objecting to an Islamic Awareness event, and white faculty member telling Ridgeway that Palestine "has nothing to do with Black history" and she needs to focus on "MLK or Harriet Tubman"—are deficient in that she fails to allege facts that any policymaker had actual knowledge of each of these instances, or she simply

12

indicates that some staff members filed complaints but does not state any actions the District did or did not take in response.

Because Ridgeway has failed to plead a District policy or custom and link such a policy or custom to her alleged injuries, the *Monell* claims brought under Section 1983 for First Amendment retaliation, violation of Due Process, and violation of Equal Protection must be dismissed against the District, and consequently, all the individually named Defendants in their official capacities.

### B. Impact of the Political Subdivision Tort Claims Act and Pennsylvania Workers' Compensation Act

Ridgeway brings state common law claims for intentional infliction of emotional distress, also presumably against all Defendants. She alleges that the Defendants' violation of her First Amendment, Due Process, and Equal Protection rights was outrageous and egregious. Defendants argue that these claims are barred by both the Political Subdivision Tort Claims Act ("PSTCA") and the Pennsylvania Workers Compensation Act ("PWCA").

### i. Political Subdivision Tort Claims Act

The PSTCA, 42 Pa.C.S.A. § 8541, *et seq.*, grants local governments in Pennsylvania, including school districts, broad immunity from civil tort suit. *Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1112-14 (Pa. 2014). The PSTCA provides, "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S.A. § 8541; *see also Renk v. City of Pittsburgh*, 641 A.2d 289, 292 (Pa. 1994) ("The Political Subdivision Tort Claims Act grants the City governmental immunity from liability for any damages resulting from an injury to a person or property caused by any act of the City, its employee, or any other person, except as specifically provided for under 42 Pa.C.S.A. §

13

8542"). Although Section 8542 contains some exceptions to this immunity for claims arising out of certain negligent acts, it does not have any such exceptions pertaining to intentional torts. Thus, Ridgeway's claims for intentional infliction of emotional distress against the District must be dismissed.

There is a different analysis when considering the question of immunity for the individually named Defendants. When a claim is grounded in negligence, employees of a local agency may be liable for acts within the scope of their official duties only to the same extent as their employing agency. 42 Pa.C.S.A. § 8545. However, unlike the government for which they work, individual employees may be liable for their own intentional actions "that are judicially determined to [involve] willful misconduct." *Renk*, 641 A.2d at 292 (citing 42 Pa.C.S.A. § 8550).

While the PSTCA exempts *the District* from liability for Ridgeway's intentional infliction of emotional distress claim, it does not shield the *individually named Defendants* from such claims. Thus, for now, the claims remain against them.

### ii.    *Intentional Infliction of Emotional Distress Claim Against the Individually Named Defendants*

Quite separately, however, some—but not all—of the Defendants succeed on their argument that the IIED claim should be dismissed against them. Here's why. Willful misconduct is 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.'" *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) (quoting *Renk*, 641 A.2d at 293). "Otherwise stated, the term 'willful misconduct' is synonymous with the term 'intentional tort.'" *Id.* (cleaned up). In that intentional infliction of emotional distress is an intentional tort, PSTCA immunity

14

does not protect the individually named Defendants against this claim.[7]

Nevertheless, in that Ridgeway's Amended Complaint does not include reference to any acts or omissions attributable to either Hill or McCrimon she cannot sustain these claims against them.  She has plead some facts related to Watlington, Rauch, Gordon, Skinner, Jubilee, Chapman, and Crowder and, absent any other argument from the Defendants, the claims against these individually named Defendants must persist.

### iii.    Pennsylvania Workers' Compensation Act

Defendants next argue that the Pennsylvania Workers' Compensation Act ("PWCA"), 77 Pa. C.S.A. §§ 1-2710, would prohibit Ridgeway's intentional infliction of emotional distress claims against the remaining individually named Defendants—Watlington, Rauch, Gordon, Skinner, Jubilee, Chapman, and Crowder—here.[8]  It does not.

Remedies for work-related injuries are generally governed by the Pennsylvania Workers' Compensation Act ("PWCA"), which was enacted "to provide employees with compensation for injuries sustained within the scope of their employment."  *Grabowski v. Carelink Cmty. Support Servs., Inc.*, 230 A.3d 465, 470 (Pa. Super. 2020) (quoting *Abbott v. Anchor Glass Container Corp.*, 758 A.2d 1219, 1223 (Pa. Super. 2000)).  The PWCA has an exclusivity provision that provides employers expansive immunity from civil tort suit:

> The liability of an employer under [the PWCA] shall be exclusive and in place of any and all other liability to such employes [sic], his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at

---

[7] The only other argument the Defendants make is in a footnote in their reply brief.  There they argue for the first time that these claims should also be dismissed because the conduct is not extreme and outrageous and did not result in a physical manifestation of injury.  Because these arguments were not raised in their Motion they will not be considered.  *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" (citation omitted)), *cert. denied*, 513 U.S. 946 (1994).

[8] The question as to whether the PWCA bars Ridgway's intentional infliction of emotional distress claim against the District is moot, given that it is immune under the PSTCA.

law or otherwise on account of any injury or death. . . .

77 Pa. C.S.A. § 481(a); *Poyser v. Newman & Co.*, 522 A.2d 548, 550-51 (Pa. 1987).

Certainly, individuals may be liable to fellow employees if the injuries are the result of an intentional wrong.  77 Pa. C.S.A. §72.  ("If disability or death is compensable under this act, a person shall not be liable . . . for any act or omission occurring while such person was in the same employ . . . except for intentional wrong.").  "[A] co-employee who is injured in the course of employment cannot hold another co-employee liable for injuries occasioned by his or her 'act or omission' (negligence); rather, such co-employee can only be held liable for injuries resulting from intentional acts."  *Gardner v. Erie Ins. Co.*, 691 A.2d 459, 463-64 (Pa. Super. 1997).  Thus, the PWCA does not preclude Ridgeway's intentional infliction of emotional distress claims against Watlington, Rauch, Gordon, Skinner, Jubilee, Chapman, and Crowder and they will not be dismissed on these grounds.

### C.  Section 1983 Claims Against the Individually Named Defendants

Left to be considered are Ridgway's Section 1983 claims against the individually named Defendants in their individual capacities[9] for First Amendment retaliation, violation of the Fourteenth Amendment's Due Process clause, and violation of the Fourteenth Amendment's Equal Protection clause.

### i.    *Group Pleading*

As an overarching matter, Defendants argue that Ridgeway's Amended Complaint must be thrown out "in its entirety" because it "pleads virtually all of the allegations in the Counts against them as a monolith," with spare reference to actions taken by any specific Defendant.

_____

[9] As explained in relation to the *Monell* claims, to the extent that Ridgeway sued the Defendants in their official capacities, her Section 1983 claims against them cannot proceed, since they are, in essence, claims against the District.

That, they say, is impermissible group pleading which warrants dismissal.  *See e.g. Salyers v. A.J. Blosenski, Inc.*, 731 F. Supp.3d 670, 683-84 (E.D. Pa 2024) (discussing group pleading); *Bartol v. Barrowclough*, 251 F. Supp.3d 855 (E.D. Pa. 2017) (explaining that complaints that violate Rule 8 are often disparagingly referred to as "shotgun pleadings").

Certainly, a complaint must "identif[y] discrete defendants and the actions taken by these defendants in regard to the plaintiff's claims."  *Garrett v. Wexford Health*, 938 F.3d 69, 93 (3d Cir. 2019) (per curiam, citation omitted); *see also Corbin v. Bucks Cnty.*, 703 F. Supp.3d 527, 533 (E.D. Pa. Nov. 21, 2023) (noting that a plaintiff must "plead[ ] sufficient facts to show that the plaintiff is entitled to relief from a particular defendant").  And, a pleading that is "so vague or ambiguous that a defendant cannot reasonably be expected to respond to it will not satisfy Rule 8."  *Garrett*, 938 F.3d at 93 (cleaned up) (citing to Fed. R. Civ. P. 8).  In other words, a complaint cannot "forc[e] both the Defendants and the Court to guess who did what to whom when.  Such speculation is anathema to contemporary pleading standards."  *Japhet v. Francis E. Parker Mem. Home, Inc.*, 2014 WL 3809173, at *2 (D.N.J. July 31, 2014).  Nevertheless, a dismissal for a Rule 8 defect is "reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Garrett*, 938 F.3d at 94 (internal quotation omitted).  As set forth below, to the extent that there are no allegations made with respect to a given Defendant that supports a particular claim against them, such claim will be dismissed.[10]

---

[10] Ridgeway argues that she has established the personal involvement of some of the individually named Defendants through the doctrine of "supervisory liability," which runs against a defendant in his or her individual capacity.  *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir.2004) (imposing supervisory liability against defendants in their individual capacities).  There are two theories of supervisory liability under Section 1983.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 128-29, 129 n.5 (3d Cir. 2010).  A supervisor is "personally involved" and thus can be held individually liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm" or if they "participated in violating [] plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [their] subordinates'

Here, Defendants argument that the allegations of Ridgeway's Amended Complaint impermissibly "group" the actions of Defendants overstates what is required by Rule 8 and understates what Ridgeway has actually alleged. While they are correct that her Amended Complaint does contain some general statements, these set the stage and other allegations concern specific individually named Defendants. As set forth below, to the extent that a particular claim against a given individually named Defendant is not supported by any pertinent allegations it shall be dismissed.

**First Amendment Retaliation**: Ridgeway—in relation to her First Amendment retaliation claims—alleges that the Defendants were aware of her political speech and reports of discrimination, they ignored these reports, they placed her under investigation and reassigned her to remote work, and they eventually recommended and imposed her permanent reassignment, a five-day unpaid suspension, and a written warning. But she has pled no facts implicating McCrimon, Hill, Watlington, or Chapman in these events. Beyond a single conclusory statement attributing knowledge to all Defendants, she neither alleges that McCrimon, Hill, Watlington, or Chapman were specifically aware of particular speech or reports of wrongdoing, nor that they took part in the decisions to investigate or discipline her. McCrimon and Hill are each mentioned exactly once in the Amended Complaint, and only in relation to their respective roles as Director of Labor Relations and Chief Operating Officer and their reporting structure—no acts or omissions are attributed to them. Watlington is only alleged to have made the decision to

---

violations." *A.M. ex rel. J.M.K*, 372 F.3d at 586 (alteration in original). As discussed above, Ridgeway did not sufficiently allege a policy, custom, or practice that results in municipal liability against the District, and so she also is unable to support claims under the first theory. Instead, Ridgeway argues for personal involvement under the second theory—that Defendants either personally participated in the violation of her rights or had knowledge and acquiesced to their subordinates' violations of her rights. To proceed under this theory, however, Ridgeway must still plead facts to support supervisory knowledge, acts, or omissions related to the purported violations. She does not do that, and, thus  she cannot rely on this theory.

delay releasing the results of the August Post investigation and Chapman told Ridgeway that she was not permitted to be represented by private counsel during the investigations and at her disciplinary hearings.   Accordingly, Ridgeway's First Amendment retaliation claims against them shall be dismissed.

**Fourteenth Amendment Due Process**: Ridgeway brings her second set of claims under Section 1983 for deprivation of her Due Process rights.  She contends that the Defendants deprived her of a "fundamental right when they reassigned her from [Northeast High] with prejudice, suspended her without pay, and issued her a written warning while denying her fair and impartial representation at hearings and arbitrarily and unreasonably delayed her investigation."  Again, Ridgeway alleges no facts at all related to actions taken by McCrimon or Hill.  Nor do the facts she alleges as to Jubilee, Rauch, Skinner, Gordon, or Crowder—namely, that Jubilee, Rauch, and Skinner edited her professional development presentation; that Skinner initiated an investigation into Ridgeway; and that Gordon and Crowder placed her on paid administrative leave or remote work pending the outcome of the investigation into the August Post—relate to the deficiencies she alleges as to the process that underlie this claim. Accordingly, Plaintiff's claims under section 1983 for violations of her Due Process rights will be dismissed with respect Jubilee, Rauch, Skinner, Gordon, Crowder, McCrimon and Hill.

**Fourteenth Amendment Equal Protection**: Ridgeway's claims for the violation of her Fourteenth Amendment Equal Protection rights, also pursuant to Section 1983, are premised on her status as a Muslim and African American, which are, respectively, religious and racial protected classes.  *See Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) (holding that race is a protected class in the Fourteenth Amendment context); *Hassan v. City of N.Y.*, 804 F.3d 277 (3d Cir. 2015) (religion).  She identifies Lisa Appel as a "similarly situated individual"

who—although not a member of either protected class—was also the subject of a disciplinary investigation by the District but who was treated differently than Ridgeway. And, Ridgeway alleges further that the differences in the treatment she and Appel received—she was reassigned to remote work or administrative leave and Appel was not; Appel allowed a private attorney and she was not—were because of her "religious beliefs and her speech regarding her religious and political beliefs, status as a Muslim, and her status as an African American." Ridgeway did not plead any actions by McCrimon, Hill, Watlington, Jubilee, or Rauch that bear on these claims— again she pleads no facts at all implicating McCrimon or Hill, her allegation to Watlington was related to his decision to delay the investigation results, and those related to Jubilee and Rauch are cabined to their alleged censorship of one of her presentations. Therefore, such claims must be dismissed against these five individually named Defendants.

### ii.    *Retaliation*

Turning now to Ridgeway's First Amendment retaliation claims under Section 1983 against Rauch, Jubilee, Skinner, Gordon, and Crowder—the only individually named Defendants against whom these claims remain. To successfully plead this claim, Ridgeway must sufficiently allege "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). Defendants make two arguments: first, that Ridgeway did not allege any plausibly protected speech, and second, that the Defendants did not take any action that could be construed as retaliation.

### a.    Protected Speech

The first question, then, in analyzing Ridgeway's First Amendment retaliation claim is whether her activities, as alleged, are plausibly protected speech. That question must be answered through the lens of her employment as a teacher at a public school in that "[s]peech by

government employees receives less protection than speech by members of the public."

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir.

2022).  "[P]ublic employees do not [however] surrender all of their First Amendment rights

merely because of their employment status."  *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454,

465 (3d Cir. 2015), as amended (Oct. 25, 2019).  When public employee speech receives

constitutional protections and when it does not is determined by looking to whether the employee

"spoke as a citizen on a matter of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417

(2006) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)); *see also Hill v. Borough of*

*Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (applying *Garcetti* to a First Amendment

Retaliation claim brought against mayor in his individual capacity).[11]

A public employee does not "sp[eak] as a citizen" when she makes a statement pursuant

to her "official duties."  *Garcetti*, 547 U.S. at 421.  "Restricting speech that owes its existence to

a public employee's professional responsibilities does not infringe any liberties the employee

might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over

what the employer itself has commissioned or created."  *Id.* at 421-22.  When a teacher acts as

the educational institution's proxy while teaching, it is the educational institution—not the

individual teacher—that has the final determination of the content and presentation of the

material—and thus the protected First Amendment interest.  *Ali v. Woodbridge Twp. Sch. Dist.*,

957 F.3d 174, 184 (3d Cir. 2020).

---

[11] If the employee is speaking as a citizen on a matter of public concern "the question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Garcetti v. Ceballos*, 547 U.S. at 417; *see also Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019).

Under that rubric, Ridgeway does not have a protected First Amendment interest with respect to the fall 2023 cancelled training on How to Teach the Genocide in Palestine in the Classroom, as well as the spring 2024 African Lecture Series presentation that was edited to remove any mention of Palestine.  In both of these instances, she was acting within her official duties when she prepared or gave these presentations.  They were to be presented to other District educators as part of the District-run and District-directed programming.  As such, the District cancelling one training and censoring the other can be viewed as simply an exercise of "control over what the employer itself has commissioned or created."  *Garcetti*, 547 U.S. at 421-22.  Since Ridgeway's only claims against Rauch and Jubilee are anchored in their role in "censoring" the second of these two professional development trainings, Ridgeway's First Amendment retaliation claims against them must be dismissed.[12]

---

[12] Ridgeway has alleged speech that, while connected to her role with the District, she says is related to matters of public concern because they were reports of wrongdoing by the District or fellow employees: (1) in August 2016, she reported that she was harassed by another teacher because of her religious affiliation; (2) in March or April 2024, at a public meeting she confronted the District about censorship of pro-Palestine speech; (3) in Spring 2024, she reported misconduct by fellow Northeast High employee Lisa Appel; (4) in April 2024, Ridgeway reported that she was assaulted in the hallways by another teacher because of her political views; and, (5) in early August 2024, Ridgeway made a report to the District that the environment at Northeast High was hostile toward Muslims.  But Defendants have not addressed in their brief any of these allegations.  Thus, any such argument is waived.  *See Nat'l R.R. Passenger Corp.*, 342 F.3d at 259 n.14 (where a party fails to adequately brief an issue, it is waived).

Ridgeway also founds her First Amendment retaliation claim on political speech at school, but  unrelated to her official duties as a high school teacher, including wearing the school-approved "Free Palestine" buttons in late 2023 or early 2024.  Other speech was  undertaken on her own time or on private social media accounts including: (1) in December 2023, she participated in Racial Justice Organizing professional development program on her own time and separate from her employment with the District; and, (2) in late 2023 or early 2024, she posted "Free Palestine" and "Israel is an Apartheid State" on her personal social media account.  But, again, Defendants make no arguments respecting any of these incidents, and, thus, any challenge to the protected nature of the remaining speech is waived.  *See Id.*

Defendants' only argument focuses on the August Post, maintaining that it falls outside the protection of the First Amendment because it was relevant only to Ridgeway's personal grievance against the Jewish Families Alliance and thus not on a matter of public concern.  Ridgeway posted "ain't no fun when the rabbit got the gun . . . part two is about to drop," but whether one instance of speech, out of many, is or is not a matter of public concern, need not be decided at this point given the Defendants' silence on all of the other allegedly protected speech plead by Ridgeway.

b.  Retaliatory Action

Accordingly, Ridgeway's retaliation claims at present remain only against Skinner, Gordon, and Crowder.  Defendants' argument that Ridgeway failed to plead these individually named Defendants participated in any actions that can be construed as retaliatory is unavailing: Skinner opened the first investigation into Ridgeway's alleged antisemitism in April 2024; and, Gordon and Crowder placed Ridgeway on paid administrative leave beginning in early September 2024.  Both of these actions are alleged by Ridgeway to be retaliatory acts meant to silence her, made in response to her First Amendment speech.  Accordingly, the First Amendment retaliation claims against Skinner, Gordon, and Crowder all survive.

### iii.  *Due Process*

All individually named Defendants, against whom Ridgeway brought a claim under Section 1983 for deprivation of her Fourteenth Amendment Due Process rights, will be dismissed, as discussed above; all, except for Watlington and Chapman.  The Fourteenth Amendment reaches state action.  It provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  "The first step in analyzing a due process claim is to determine whether the asserted individual interest . . . is encompassed within the Fourteenth Amendment's protection of life, liberty, or property."  *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (cleaned up).  Though there is no *substantive* Due Process right to public employment, *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 143 (3d Cir. 2000) (Alito, J.), in the *procedural* due process context, "[p]roperty interests are not created by the Constitution," but, instead, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  A "unilateral expectation of continued employment" does not

amount to a constitutionally protected property right. *Elmore*, 399 F.3d at 282. However, when

an employee can only be fired for just cause, "the employee develops a cognizable property

interest in her continued employment, and the government may not fire her without providing

procedural due process." *Dee v. Borough of Dunmore*, 549 F.3d 225, 230-32 (3d Cir. 2008).

Ridgeway alleges that she had a "fundamental right" in her employment with the District which

was harmed when Defendants denied her independent or private representation and delayed her

investigation.

While Defendants concede, for the purpose of the Motion to Dismiss, that Ridgeway had

a protected interest in her employment, they argue that her Fourteenth Amendment Due Process

claim must be dismissed because the District did, in fact, satisfy procedural due process, which

requires only notice and an opportunity to be heard. *See Cleveland Bd. of Educ.*, 470 U.S. at 546

("a tenured public employee is entitled to oral or written notice of the charges against him, an

explanation of the employer's evidence, and an opportunity to present his side of the story."). By

her own admission, Ridgeway was afforded multiple pre-deprivation hearings and an appeal

before the District imposed the suspension and reassignment. Therefore, Ridgeway's Due

Process claims shall be dismissed against Chapman and Watlington.

### iv.    *Equal Protection*

The Equal Protection Clause commands: "No State shall . . . deny to any person within its

jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Ridgeway's claim for a

"Violation of Fourteenth Amendment Equal Protection," also pursuant to Section 1983, is

premised on her status as a Muslim and African American, which are, respectively, religious and

racial protected classes.[13] *See Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002)

---

[13] Ridgeway makes the additional argument that she was subject to disparate treatment because of her speech

(holding that race is a protected class in the Fourteenth Amendment context); *Hassan v. City of N.Y.*, 804 F.3d 277 (3d Cir. 2015) (Equal Protection clause requires religious affiliation to receive heightened as a suspect or quasi-suspect class).  Chapman, Skinner, Gordon, and Crowder given the discussion *supra* are the only remaining individually named Defendants against which this claim still, at present, survives.  The claim against them is premised on the following: Chapman telling Ridgeway that she was not allowed to be represented by private counsel at her disciplinary hearing; Skinner approving Appel's sabbatical; and, Gordon and Crowder placing Ridgeway on administrative leave.

    a.   <u>Protected Class</u>

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." *Andrews*, 895 F.2d at 1478 (internal citation omitted).  Under a protected classification theory, a plaintiff must allege "[s]he was treated differently than other similarly situated [individuals], and that this different treatment was the result of intentional discrimination based on [her] membership in a protected class." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016) (citing *Hassan v. City of N.Y.*, 804 F.3d 277, 294, 298 (3d Cir. 2015)).  Vital to this claim is the identification of "similarly situated parties," *Perano v. Twp. of Tilden*, 423 Fed. App'x 234, 238 (3d Cir. 2011), who are "alike 'in all relevant aspects'" to her, *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  "[T]he failure to identify similarly situated persons dooms an equal-protection claim." *Stradford v. Sec'y Pa. Dep't of Corrs.*, 53 F.4th 67, 74 (3d

---

regarding her political views, but being "Pro-Palestine" is not a protected class.  *See United States v. Skirmetti*, 605 U.S. ___ (2025) (Barrett, J., concurring) (discussing protected classifications and noting that the Supreme Court "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so.").

Cir. 2022) (citing *Hill*, 455 F.3d at 239).

Ridgeway identifies Appel, as a "similarly situated individual" who belongs to neither protected class and received different treatment. While Defendants do not challenge her characterization they argue that the claims must be dismissed because neither Gordon, nor Skinner, nor Chapman, nor Crowder were personally involved in the disparate treatment.

b.  Disparate Treatment

Appel was placed under investigation in the Summer of 2024. She requested, and, through Skinner's intervention, was granted a sabbatical while her investigation was ongoing. But unlike Appel, while Ridgeway's investigation into the August Post was underway, she was instead placed on paid leave or remote work by Gordon and Crowder.[14] Fatal to Ridgeway's claims against Skinner, Gordon, and Crowder, however, is that—as Defendants point out—there is no information to suggest that Ridgeway ever requested a sabbatical herself, or that such a request was denied by the District. Absent such information, it cannot be determined whether Ridgeway and Appel were actually "alike in all relevant aspects" and therefore "similarly situated" for the purposes of an Equal Protection analysis. *See Startzell v. City of Phila.*, 533 F.3d 183 (3d Cir. 2008) (finding protest groups were not similarly situated where one complied with police orders to disperse and the other did not and its members were arrested). Accordingly, Ridgeway's Equal Protection against Skinner, Gordon, and Crowder will be dismissed.

The same cannot be said about Ridgeway's Equal Protection claim against Chapman, which is based in her denial of Ridgeway's request to have a private attorney present for her

---

[14] In her response brief, Ridgeway alleges additional facts about Appel being allowed to return to the classroom after she returned from her sabbatical and while her investigation was still pending. Because this fact does not appear in the Amended Complaint, it shall not be considered. *See Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation and internal quotation marks omitted))

disciplinary hearings in contrast to Appel—who was allowed one.  Unlike her allegations regarding the sabbatical, here Ridgeway's allegations are clear; she requested either alternative representation from the District or the right to be represented by a private attorney and was denied by Chapman; Appel made a similar request which was granted.  It is plausible given that Chapman had the authority to deny Ridgeway's request that she also had the authority to approve Appel's request for private counsel.  Thus, the Equal Protection claim survives against Chapman alone.

### v. *Qualified Immunity*

Separate from their arguments on each of these claims against them, the individually named Defendants maintain that they are protected from liability by the doctrine of qualified immunity, which "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Stringer v. Cty. of Bucks*, 141 F.4th 76, 84 (3d Cir. 2025) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The government official bears both the burden of pleading the qualified immunity defense, *see Stringer*, 141 F.4th at 86, and the burden of persuasion, *see Burns v. Pa Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011) ("The burden of establishing qualified immunity falls to the official claiming it as a defense.").  The doctrine of qualified immunity shields government officials unless: (1) they violated a statutory or constitutional right; and (2) the right was clearly established at the time of the challenged conduct.  *Reichle v. Howards,* 566 U.S. 658, 644 (2012).  District courts have discretion as to the order in which to address the two-part test.  *Egolf v. Witmer,* 526 F.3d 104,110 (3d Cir. 2008).

At the motion to dismiss stage, the analysis first prong "overlaps with a district court's inquiry under Rules 8(a) and 12(b)(6) [and] . . . a well-pleaded §1983 complaint necessarily

alleges a constitutional violation for purposes of qualified immunity, while a complaint that fails to plausibly plead the violation of a right does not." *Stringer*, 141 F.4th at 85.    In other words, a prong one analysis, as implemented here, is a straightforward determination of whether the facts in Ridgeway's Amended Complaint are sufficient to support a Section 1983 claim.

Under prong two, for a right to be clearly established, it must be "sufficiently clear that [every] reasonable official would understand that what he is doing violates that right." *Id.* at 85 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  This is a narrow inquiry which must be made "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (*per curiam*); *see also Mullenix v. Luna,* 577 U.S. 7, 12 (2015); *Rivera v. Redfern,* 98 F.4th 419, 422 (3d Cir. 2024).  Because of the fact-intensive nature of this analysis, conducted in light of the specific context of the case, "qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." *Stringer*, 141 F.4th at 86 (internal citations omitted).

Across Ridgeway's three claims—First Amendment retaliation, Due Process, and Equal Protection—Defendants make the same general arguments: either (1) qualified immunity applies because Ridgeway, in failing to tie the alleged violation to an action of a particular Defendant, did not meet prong one of the qualified immunity test and sufficiently plead the violation of a constitutional right; or, (2) the right at issue was not clearly established.[15]

a.  Retaliation

To reiterate, the only individually named Defendants who are still up against Ridgeway's First Amendment retaliation claim are Skinner, Gordon, and Crowder.  As set forth above,

---

[15] In that the Amended Complaint has failed to allege cognizable claims for the violation of her Due Process rights, it has not made a showing under prong one of the qualified immunity analysis for these claims.

Ridgeway has plead a violation of her First Amendment speech right by alleging that these individually named Defendants, in opening the disciplinary investigations and removing Ridgeway from the classroom, retaliated against her for her pro-Palestine political speech and reports of employee wrongdoing.  Accordingly, she has met prong one of the qualified immunity in that she has plausibly plead a constitutional injury arising from the violation of her First Amendment rights.

Defendants, thus, have the burden of showing that the right was not clearly established to be afforded immunity.  As to this second prong, Defendants argue that, with respect to Ridgeway's August Post, "aint no fun when the rabbit got the gun . . . part two is about to drop," the "narrow inquiry" for the qualified immunity analysis is whether Ridgeway "had the right to allegedly threaten JFA and its members."  However, as explained above, this one social media post is not the universe of the speech at issue.  Ridgeway makes multiple other plausible allegations that are unaddressed by the Defendants, including her pro-Palestine advocacy throughout 2023 and early 2024 and her August 2024 report of a hostile environment at Northeast High.  It is the Defendants' burden to establish qualified immunity and by failing to address the other speech, this burden has not been met, and qualified immunity has not been established for the claims remaining against Skinner, Gordon, and Crowder.

b. Equal Protection

Defendants argue that Chapman, the only Defendant against whom Ridgeway's Equal Protection claim has survived, should be protected by qualified immunity because Ridgeway failed to plead her personal involvement.  But, in that Ridgeway has alleged Chapman's personal involvement in the disparate treatment vis-à-vis Appel—disallowing private counsel from representing Ridgeway while Appel was allowed private representation—Chapmans' qualified immunity argument, chained to the assumption that Ridgeway did not plead this connection,

fails.  Absent other argument, Defendants have not met their burden to show that qualified

immunity shields Chapman from this claim.

### D.  Pennsylvania Whistleblower Law

Ridgeway's final claims are brought under the Pennsylvania Whistleblower Law.  43 Pa.

C.S.A. §§1421-28, which provides, in relevant part:

> No employer may discharge, threaten, or otherwise discriminate or retaliate against an
> employee regarding the employee's compensation, terms, conditions, location or
> privileges of employment because the employee . . . makes a good faith report or is about
> to report, verbally or in writing, to the employer or appropriate authority an instance of
> wrongdoing or waste.

43 Pa. C.S.A. §1423(a).  Accordingly, to state a cause of action under the statute, Ridgeway must

allege: (1) she reported or was about to report an instance of wrongdoing to an appropriate

authority; and, (2) she subsequently suffered a reprisal.  43 Pa. C.S.A. §1424(b).  She must also

"show by concrete facts or surrounding circumstances" that the report led to the reprisals.  *Gray

v. Hafer,* 651 A.2d 221, 225 (Pa. Commw. 1994), *aff'd per curiam,* 669 A.2d 335 (Pa. 1995).

Defendants argue that Ridgeway did not allege that she made any such reports nor that the

individually named Defendants engaged actions that could be viewed as retaliatory.[16]

But, a reprise of the allegations in the Amended Complaint show otherwise: (1) in Spring 2024,

she reported Appel for recording and posting the identity of a student in the Jewish Families

Alliance social media group; (2) in March or April 2024, she confronted the District about

censorship of political speech in support of Palestine; (3) in April 2024, she reported that she was

assaulted by another teacher because of her pro-Palestine politics; and, (4) in August 2024, she

---

[16] Defendants make a passing reference to the insufficiency of the causal connection between the reports and the
reprisals, and a citation to *Gloaschevsky v. Commonwealth Det't. of Envtl. Prot.,* 720 A.2d 757.  Yet they provide no
further explanation or argument as to why this connection is insufficient.  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l
Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . but not squarely argued, are
considered waived.").

reported to the District that the environment at Northeast High had become hostile toward her and other Muslims.[17]  Ridgeway further alleges that these reports led to at least two of the three investigations into her conduct—one beginning in April 2024, the other shortly after her report of a hostile environment at Northeast High—as well as her removal from the classroom, her disciplinary suspension and her reassignment away from Northeast High.  As discussed above, Skinner, Gordon, and Crowder participated in these alleged reprisals by opening the investigations, assigning Ridgeway to remote work, and removing her from her classroom. To be sure, the claims must be dismissed against McCrimon and Hill since no facts were alleged as to either in the Amended Complaint, and against Watlington, Chapman, Rauch, and Jubilee since the only allegations concerning them were unrelated to any possible whistleblowing or the retaliatory investigations.  But because Ridgeway otherwise made allegations in her Amended Complaint that the decision to open these investigations and impose discipline, including a change in her employment location, the Defendants' argument does not prevail as to Skinner, Gordon, and Crowder and the District.

## IV.    CONCLUSION

As discussed above, the Defendants' Motion to Dismiss shall be granted in part and denied in part as follows:

- The claims of Retaliation under Section 1983 against the District, as well as McCrimon, Hill, Watlington, Chapman, Jubilee, and Rauch shall be dismissed but shall not be dismissed as to Skinner, Gordon, and Crowder;

---

[17] Despite Ridgeway's argument to the contrary, the August Post cannot be seen as a plausible report under the Whistleblower statute.  Though Ridgeway asserts that this post was a threat to "expose the Districts [sic] wrongdoing" via a second social media post, the Pennsylvania Whistleblower Statute requires the report be made to the employer or appropriate authority.  *See* 43 Pa. C.S.A. § 1422 (defining "appropriate authority" as "[a] Federal, State or local government body, agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency or organization.").  The August Post was made on Ridgeway's personal media account and not directed at such an authority.

- The Section 1983 claims for violations of Due Process against all Defendants shall be dismissed;

- The Section 1983 claims against the District, McCrimon, Hill, Watlington, Jubilee, Rauch, Skinner, Gordon, and Crowder for Violation of the Equal Protection Clause shall be dismissed but shall not be dismissed as to Chapman;

- The claims for Intentional Infliction of Emotional Distress against the District, McCrimon and Hill shall be dismissed but shall not be dismissed as to Watlington, Chapman, Rauch, Jubilee, Skinner, Gordon, and Crowder;

- The claims made pursuant to Pennsylvania's Whistleblower Law shall be dismissed against McCrimon, Hill, Watlington, Chapman, Jubilee, and Rauch but shall not be dismissed against Skinner, Gordon, Crowder, and the District.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, C. J.**